# CHARLESTON.

FOSTER-THORNBURG HARDWARE COMPANY . *et al. v.* ARDMORE COAL COMPANY *et al.*

(No. 6486)

Submitted October 22, 1929.   Decided November 12, 1929.

*Holt & Holt* and *Connor Hall,* for appellants.
*George S. Wallace,* for appellees.

LITZ, JUDGE:

On or about July 10, 1926, Ardmore Coal Company, a coal mining corporation, operating mines in Boone county, West

Virginia, transmitted, by mail, to its creditors the following proposal, to-wit: ''A suit is now pending in the Circuit Court of Boone county, West Virginia, having for its purpose the appointment of a receiver for the Ardmore Coal Company, a sale of all its assets and payment of the proceeds pro rata to the creditors. That proceeding, while the only thing that could be done at the time of its institution to save the assets from sales under levies of executions and other levies, will require time and considerable expense, and it seems doubtful if the creditors in the end would be paid in full. ·

Under the circumstances, it has been tentative agreed that:

First. One of the properties owned by the Ardmore Coal Company, consisting of leases on about 40 acres of coal, more than half of which has been worked out, a side tract, cheap tipple and some mine tract, mine cars and equipment inside the mine, be. sold to Dr. W. F. Harless, or to a company to be organized by him, in consideration of the assumption of a judgment against the Ardmore Coal Company for $1625.00 with interest from May 3, 1926, and $12.00 costs in favor of Henry Keadle, E. C. Knabb and I. G. Stollings, and which judgment was taken for unpaid royalties on about 30 of said 40 acres of coal. The minimum royalty on said 30 acres of coal is $1500.00 a year, and on the remaining ten acres there is no minimum royalty. Our estimate is that there is not more than 35,000 to 40,000 tons of recoverable coal in the whole 40 acres and not more than two railroad cars a day can be mined therefrom. The company has no buildings of any value on said property and very little machinery and equipment. The lease is regarded as a liability and not an asset, and it is believed the disposition of that property as above outlined is to the advantage of the Ardmore Coal Company and its creditors especially as said judgment for royalty is a first lien on that property.

Second. Organize a corporation to take over all of the remaining properties of the Ardmore Coal Company consisting of leases on approximately 2600 acres of adjacent tracts of coal lands upon which the principal mining plant and properties of the company are, in consideration of the assumption by the new company and its agreement to pay all the other

creditors of the Ardmore Coal Company and keep and perform the terms of said leases. Fifty per cent of the stock of the new company is to be given to the Lewis-Hale Coal Company of Huntington, West Virginia, a coal buying and selling organization, in consideration of its managing the mines, selling the coal and keeping the books of the new company, until all creditors are paid in full, without cost to the new company. Under this arrangement there will be no salaries paid by the new company to managing officers and directors, no charge for selling the coal and no charge for keeping the books, until all creditors are paid.

Third. The creditors of the Ardmore Coal Company will accept the notes of the new company for the full amount of their claims and in discharge of the Ardmore Coal Company which will be dissolved. These notes will be renewed from time to time but at each renewal will be curtailed by their pro rata amount of the accumulated profits of the new company.

The total indebtedness of the Ardmore Coal Company, exclusive of the judgment to be assumed by Dr. Harless, is, as shown by the books of the company, less than $35,000.00, and it is our opinion the new company under the new management and without charge for salaries, selling the coal and keeping the books, can work out in a reasonable time and pay all creditors in full with interest.

The consent and agreement of the creditors to this arrangement is necessary before it can be worked out, and if the creditors, or any of them, cannot agree thereto the receivership proceeding will have to go on.

This proposition is being sent to all creditors having claims over $200.00. It will require about $1,600.00 to pay off and discharge all claims under $200.00 and it is proposed to pay all such claims in full at once.

If the creditors will manifest their consent and agreement to the above plan by signing the approval and acceptance at the bottom hereof, the plan will be at once carried into effect. It is important that the creditor act promptly.''

The creditors having accepted the proposal, the appellants, J. H. Lewis and C. C. Hale, trading as Lewis-Hale Coal Com-

pany, who had already assumed the management of the Ardmore Coal Company, under a similar arrangement with A. J. Dalton, president and chief stockholder thereof, continued to produce and sell coal from its mines, pursuant to said agreement, until October 30, 1926. On October 4, 1926, Yale Coal Company was organized and, by written assignment, took over the asets of the Ardmore Coal Company. The business, however, continued in the name of the Ardmore Coal Company. On October 19, 1926, Lewis agreed to transfer the management to Dalton. This, according to the testimony of Lewis, was due to the objection of Dalton to the distribution among the creditors of Ardmore Coal Company of the profits which had then accumulated under the management of appellants, and other conduct of Dalton evincing a desire to control the affairs of the corporation. In accordance with this agreement, appellants wrote Dalton, as president of Ardmore Coal Company, on October 27, 1926, as follows: ''On or about May 20, 1926, you came to our office and advised us that you were desirous of making us a proposition to take over the management and sale of the coal of the property of the Ardmore Coal Company located at Hadalton, Boone county, West Virginia, on the Coal River branch of the Chesapeake & Ohio Railway Company. A tentative arrangement was made whereby we advanced the Ardmore Coal Company $1100.00 to pay the back power bill so that the mines might be started up, and on May 25 you brought the books of the company from your office to our office and told us to begin the management of the property, keeping the books and sale of the coal produced at the mines, for which service you would enter into an agreement with us on the basis outlined in a letter of agreement sent out to all of the creditors of the Ardmore Coal Company by E. L. Hogsett, Attorney for the Ardmore Coal Company. On October 19, 1926, you came to our office and advised us that you were unwilling to enter into such an agreement and we advised you that we would not be agreeable to going further with the proposition except as originally set out in Mr. Hogsett's letter to the creditors of the Ardmore Coal Company, and that we would terminate our management of

the mines and sale of the coal on Saturday, October 30, 1926, on the following terms and conditions.

First: That all orders which we now have on file for coal from the mines of the Ardmore Coal Company be completed as per shipping directions on the orders. According to our records, there are orders on file in our office for 107 cars as of this date, and no more orders will be taken for coal for the Ardmore Coal Company except from day to day for Tidewater shipment up to and including shipments of Saturday, October 30, 1926. The order for the 107 cars call for inland shipment at the rate of 22 cars per week, and this must be shipped accordingly; otherwise, we will be compelled to buy the coal on the open market as required by our customers and charge any difference in the sales price and purchase price to the account of the Ardmore Coal Company, its successors or assigns. These orders were taken in good faith by us for the benefit of the Ardmore Coal Company, and both the Ardmore Coal Company and ourselves are definitely obligated for this coal.

Second: That we will charge the Ardmore Coal Company our regular commission of 8 per cent of the sales price of all of the coal to be shipped until the termination of our management of the mines and also on all of the coal which is necessary to ship to complete all of our orders as outlined above.

We will notify all concerned by a letter going out in the mail on October 30, 1926, that we have severed our relationship with the Ardmore Coal Company, its successors or assigns.

If this arrangement is satisfactory and meets with your approval in every detail without qualification, we will deliver the books and records, together with files and other property now in our possession,. to whomever you may direct, at the close of business October 30, 1926. Please let us have your reply by return mail and oblige.'' The record is barren of any reply from Dalton.

This suit was instituted in January, 1927, by Foster-Thornburg ·Hardware Company and Charleston Electrical Supply Company, suing on behalf of themselves and all other creditors of Ardmore Coal Company and Yale Coal Company, against

Ardmore Coal Company, Yale Coal Company, A. J. Dalton, J. H. Lewis and others, for the purpose of requiring J. H. Lewis and Lewis-Hale Coal Company to account for the coal sold under the agreement with the creditors, and of administering the assets of the Ardmore Coal Company and Yale Coal Company.

A decretal judgment was entered by the circuit court, in accordance with the report of the commissioner—finding the appellants, J. H. Lewis and C. C. Hale, trading as Lewis-Hale Coal Company, to be indebted to the Ardmore Coal Company in the sum of $17,829.59, as profits earned by them in operating its mines, subject to a credit of $3,955.52 paid by them to E. L. Hogsett, special receiver, since the institution of the suit. The appellants, asserting further credits to the extent of the judgment, claim that on the 8th day of September, 1926, they sold, in the name of the partnership, to Commercial Coal Company of Detroit, Michigan, 25 cars of coal at $1.50 per ton to be shipped, at the rate of one or two cars per day, from the mines of the Ardmore Coal Company, 13 of which had been shipped when they relinquished the management of the business to Dalton; that on October 8, 1926, they also sold, in the name of the partnership, to Richmond, Fredericksburg & Potomac Railway Company, 100 cars of coal at $1.75 per ton to be delivered at the rate of 20 cars per week from said mines, only 12 of which had been shipped at the time Dalton assumed control; that no shipments having been made thereafter under either sale and the price of coal having advanced, the Commercial Coal Company charged the appellants with $726.25, the difference between the contract price and the price it was compelled to pay for coal in the open market; that the Richmond, Fredericksburg & Potomac Railway Company likewise charged the appellants $8,750.00, the difference between the contract price and the price it was required to pay for coal in the open market; and that having relinquished the management to Dalton because of his interference with their management, they are entitled to eight per cent of the sale price of the coal as compensation for their services.

The creditors having become parties thereto by accepting

the proposed agreement, could not be deprived of its fruits by subsequent understanding between Lewis and Dalton. The appellants, not being entitled to compensation from the profits of the business under the contract until the creditors were paid, cannot create in themselves such right merely by abandoning further performance of the contract. Nor are they entitled to credits based upon sales in the name of the partnership of coal from the mines of the Ardmore Coal Company. They could have saved themselves from personal liability, if in fact any has been incurred, by making the sales in the name of the Ardmore Coal Company as contemplated by the agreement. The decree of the circuit court is therefore affirmed.

*Affirmed.*